Judge Jeremy D. Fogel from the United States District Court for the Northern District of California, sitting by designation of the Chief Justice. We appreciate his assistance. Our first case this morning is 07-1112, Americans Seating v. USSC Group. Mr. Dickinson? Yes. May I please report? The jury in this case awarded Americans Seating a cross-profit damages for passenger seats that are normally sold together with a patented wheelchair-securement system based upon a patented ARM tie-down. The jury did so after being properly instructed on the right-weight standard, and they did so based upon substantial evidence showing that, one, there is a functional relationship between the patented ARM tie-down and the passenger seats, and two, the patented ARM tie-down was the basis for customer demand for the passenger seats. Let me make sure I understand the exact scope of what the jury awarded. In these buses where there's a tie-down, there's often a flip-up seat that's in the same area as the tie-down. Correct. Now, was this award for only the one flip-up seat or for the entire set of seats in the bus? All the passenger seats, including what we call fixed seats as well as flip-up seats. Okay. That's what I thought. I just wanted to make sure. There is a functional relationship because the patented ARM tie-down cooperates with passenger seats on a city bus to facilitate the dual use of wheelchair-securement equipment for either accommodating wheelchair passengers or ambulatory passengers. This is a functional relationship that is described in the summary of the invention of the O3-N at A143 of the appendix. Again, going back to my first question, I could see an argument that there's a functional relationship between the tie-down and the particular seat that flips up or down right in the area of the tie-down, but how does the tie-down, I suppose the tie-down is in the front of the bus, how does that functionally relate to the seat that's in the back of the bus? You might want to have, for aesthetic reasons or convenience or ease of ordering all the seats from one place, all the seats ordered from one company, but I don't see that as a functional relationship. Well, let me get to that. I'm going to hopefully persuade you that the passenger seats are all of a kind, all the passenger seats need to be related and interchangeable, and that's one of the things that I will show with the visual. I just want to say before I get to that that the ADA mandates that the city buses accommodate both wheelchair and ambulatory passengers, and therefore from the standpoint of the bus builders and transit authorities, the patented ARM tie-down serves no useful purpose and has no commercial value without passenger seats to outfit an ADA-compliant city bus. Therefore, the seats in the securement are analogous to components of a single assembly, and to address your question further, I think it would be helpful if we look at the securement area, and I'm going to try to relate that as well to the seats outside the securement area. A474 and A475 in the appendix are photographs of the skid-mounted mock-up of the ARM tie-down by Dave McLaughlin of the Triwoods of the Peak. The district court sentenced J.M.R. Goulding to McLaughlin's demonstration did not include passenger seats, however the transcript of what McLaughlin actually said during the demonstration in 1845 in the appendix suggests otherwise. In any event, it was beyond dispute that McLaughlin referred to the ARM training video that was shown in the jury, which is A490 with a CD in the appendix. And that video plainly shows the operation of the passenger foot-seats in conjunction with the securement of a wheelchair passenger using the ARM. I've taken that training video and blown up two video stills from the video in about 1 minute 45 seconds of running time for the top image that you see back here and about 1 minute 55 seconds for the bottom image. Well, what I think this shows is, first of all, this is the foot-seat in the down position, this is the foot-seat in the up position. This diagonal line here is the lap belt that secures the wheelchair passenger in his wheelchair when the wheelchair itself is tied down. Notice how the ARM down here. Notice how when the ARM is retracted in its door position and the seat is folded down, the seat actually serves as a guard or a cover so that the air on the floor there is less tripping hazard for passengers. Now, with respect to the connection between fixed and flip-up seats, in this question, I had acknowledged that one function here is an integrated matching appearance. These flip-seats, this is a section of fixed seats here, share a common appearance, but also notice this line here, this is an armrest. This armrest is on the fixed seat and it operates to prevent passengers sitting on the flip-seat from sliding forward off the seat in the event of a sudden stop by the bus. This is a requirement that is specifically required in the specification of Los Angeles Transit Authority at 8456, Santa Monica Transit Authority at 8456. Is there any reason why others can't make fixed seats the same way? I guess it had to do with coordinating and integrating the use of the bus. Would it be possible for two different seat suppliers to cooperate and coordinate in this way? Perhaps. What the customers want is to make sure that they have one supplier that makes sure that fixed and flip-up work together. Is that enough? I mean, is customer demand without some functional relationship enough to get you the convoyed sales? I think you need functional relationships. Is there a functional relationship other than common appearance? I think that the armrest, which is part of the fixed seat, has to be there. It can't be on the flip-up seat. So this is providing a function. The armrest on the fixed seat provides a function relative to passengers on the flip-up seat. But that's not patented, is it? No. Maybe I'm not asking the question right, but I'm wondering why anybody who makes seats can't just provide those fixed seats without violating anybody's patent? Well, they can't, other than the fact that they don't look right. Maybe they won't look exactly the same aesthetically, but functionally they'll be the same. Well, let me also— Well, maybe you could get to precisely what is the functional relationship. I think we've been asking it a different way. What precisely is the functional relationship that ties those with the tie-down? The fixed seats were— Right. Well, I think you have to say that the tie-down has a functional relationship with the flip-seat, and the flip-seat is related functionally to the fixed seat. One of the shared common components, which I'm holding in my hand, which is this insert. This is a removable piece that is designed to be interchangeable. American Seating has this feature. U.S.S.C. has this feature. This is touted in the U.S.S.C. sale brochure for the Aerie seat, which promotes the sale of both fixed and flip-up seats. These are interchangeable, being fixed and flip-up, and this facilitates the customers keeping one stockpile of replaceable inserts. These things are designed to be easily removable because the seating surface is becoming worn, and the soil needs to be replaced. Well, you're into your rebuttal time. Would you like to save it? I just want to say that that brochure also demonstrates that a selling point of the Aerie seat by U.S.S.C. is a selling point. The touts of the DEPRO securement system is a selling point for this seat, and the testimony of Dave Laughlin, Richard Hammershaw, David Kiernan, and Howard all establish that customer demand for the ARN, for the wheelchair secure... Well, you're repeating yourself now. There's a limited amount of time. Mr. Gaffin? Good morning. The most telling evidence which demonstrates that the fixed seats and the restraint at issue do not have a functional relationship is Mr. McLaughlin's own Portland demonstration, Appendix 474, that showed that the restraint works perfectly fine... That's the video. ...perfectly fine without the fixed seats. That alone demonstrates no functional relationship, and American Seating can't run, and it can't hide from that demonstration. And to solidify or confirm that, all you have to do is look at what Mr. McLaughlin, American Seating's vice president, who did the demonstration, said at page 328 of the appendix. He agreed that to make the restraint work, you don't need the fixed passenger seats. You don't need to get very much more into the record to determine that there's absolutely no functional relationship between the restraints and the fixed seats in the bus. So when the trial court granted the post-trial motion and reduced the jury verdict in active property, there was no substantial evidence to support the verdict that the fixed seats were a convoyed sale of the restraint system. Now the restraint system, again, to make sure that I understand, the line is drawn here between what was considered to be within the proper award of damages and what was not. The restraint system included the flip-up seats or not? The restraint system included the barrier. The restraint system did not include the flip-up seats. We asked the trial judge to separate flip and fixed seats, and he refused. And he let it go to the jury. But American Seating didn't apportion or separate that out either. Okay, so the award here was cut back so that it included only the restraint system and not the flip-up seats? In other words, what the judge excluded, to ask the question more clearly, was not just the fixed seats but also whatever damages would be associated with the flip-up seats? I think so, because American Seating wasn't clear in how it apportioned the calculation of damages between restraint. Restraint and barrier were included. Whether the flip seats were on the restraint side or on the fixed seat side is not clear from their proofs, which is a failure of proof on their part, another reason the award has problems. But it was clear that the majority of the convoy sales were the fixed seats in the back of the bus. But I have the same question Judge Bryson does. The convoy sales were all of these seats, both the flip seats and the passenger seats, as far as we can tell. I believe that's how American Seating attempted to prove its damage claim. But going back to the fundamental question of functional relationship, which is the legal test and right height, there simply is not. The restraint worked perfectly fine without all those fixed seats in the back of the bus. The evidence is overwhelming in that regard. You have not only American Seating's admissions and demonstration, you have evidence that customers bought seats and restraints from two different suppliers, including the inventor, Mr. Ditch, his own transit authority bought seats and restraints from two different suppliers. And if the only way the American Seating restraint works is to have the American Seating fixed seats in place, American Seating's got a problem. That alone undermines its argument. Two, the customers acknowledged no functional relationship. Mr. Murr said, from one of the transit authorities at Appendix 246, agree that you don't need the fixed seats to make the restraint work. Right from the horse's mouth, the user. Three, the patent itself is silent about the need for the fixed seats in the bus to make the restraint work. There's nothing in the specification about that. Four, you have testimony from customers, Mr. Murr said and Mr. Ditch, that while it's convenient to buy from one source, that the convenience, customer demand, business advantage, marketing advantage is not the test. I think Reithe lays that out fairly clearly, and I think that's the appropriate test. What I think American Seating's trying to do is make this legal logic that if the restraint and the flip seats have some functional relationship, and then if the flip seats and the fixed seats have some relationship, ergo, the restraint and the fixed seats have a relationship. That's not the legal test, that legal logic that doesn't apply here. Reitheit requires a functional relationship. It requires a sale, and it discards arguments that convenience, business advantage, get you there. And American Seating's attempt at reliance on paper converting doesn't get there. Paper converting was a case that is, I think, limited by Reitheit. Reitheit specifically says that sales for convenience, business advantage, marketing advantage simply don't meet the legal requirement here. Same with Juicy Whip. We see this argument on aesthetics or appearance. Well, in Juicy Whip, appearance is part of the patent. Syrup needs a dispenser, dispenser needs to dispense something. Much closer relationship here with aesthetics. And, in fact, you can go on buses in this very city, on the circulator, and see seats that look different. I think the end and the simple answer is American Seating simply didn't meet its burden of showing the functional relationship required by the case law. The jury got it wrong. The trial judge got it right. He sat there, he listened to the evidence, he saw the courtroom demonstration, and his grant of judgment as a matter of law on that issue was proper, and his reduction of the jury award was proper and should be affirmed. I want to move to our cross-appeal. The trial judge didn't get everything right. But most of it. We have two issues on our cross-appeal. One, the argument that American Seating is entitled to damages for sales of a non-infringing Bepro2 restraint system made by the defendant, based on an argument that the defendant first offered an infringing Bepro1 device and then switched the customer to the non-infringing device. That argument is not supported by the trial record. When you look at the record evidence very carefully, you'll have to conclude that American Seating did not meet the burden it had to put into evidence facts that support the contention that USSC first offered a Bepro1 for sale. We're going to ask this panel to reverse the trial court's refusal to grant judgment as a matter of law on that issue. What is the trial record? Only five sales had issued here. Austin, Southeast Philadelphia, Los Angeles, Jacksonville, and Contra Costa, CCCTA, I think it is. 824 units. And those sales also included, the award originally included convoy sales, which had been stricken by the trial judge. Only two other quotes are in evidence for those five sales, and those two quotes offer for sale a Bepro. But at the time those quotes were made, both the Bepro1 and Bepro2 were available for sale, Bepro2 being a non-infringing device. There could be no inference that that referred to the Bepro1 when the Bepro2 was available, and there's no record evidence to clarify that in that regard, except for one thing. American Seeding did introduce an email, I think it's Exhibit 8, or Appendix 636-637, from USSC's engineering director, or sales director. That's what American Seeding relies on, that the only evidence they have that they can use to rely upon to say that there's a Bepro1 offered for sale. Don't they also have a customer who said that they didn't want the Bepro2? Interesting. They put that Mr. Peterson from American Seeding testified that Los Angeles didn't want the Bepro2. However, the record evidence that American Seeding later put in showed that Los Angeles in fact took the Bepro2. That evidence goes no more than saying the customer was concerned, but apparently the concerns were overcome because the customer eventually bought the Bepro2. That evidence doesn't prove anything, at least in terms of the reluctance to switch. The second big, that's one of the two big contracts here, Los Angeles. The other is South Philadelphia, separate. With respect to the South Philadelphia project, the email that American Seeding relies so heavily upon to make this argument specifically says that the customer accepted the change. And it's our contention that when the customer knowingly decides to take the different non-infringing product, that cuts off causation. Customer choice, new sale, no causation. Even if you got your foot in the door with the infringing device, which, let's say by hypothesis, you never would have gotten to the customer. The customer is very interested in the infringing device. You sit down with the customer and then you're just about to conclude the contract and you say, well, actually we're going to offer something, an upgrade, which in fact is the non-infringing device, a bait-and-switch, to use the common parlance. That you think there's no basis, even on those facts, for concluding that a damage award would be appropriate in that situation. I recognize you don't think that's this case, but the proposition that you've laid out for us would include that case. That is to say where the customer ultimately agrees to the second product, cuts off all damages. Would you think that that would apply even in my case? I would say yes. I think that when the customer makes a knowing choice to take a different product, that can't be an infringing sale. Frankly, we asked the child judge to make that and change the jury's direction, and the child judge refused. But I do think that when the customer gets to make the choice, decide between the two products, decides the upgrade is the product it wants, that cuts off causation. But on this record, it's paltry. American Seeding simply didn't put in the evidence that it needed to put in. It sought no testimony from the customers. Again, it's only a handful of customers and two big projects. Perhaps the better course of action was to bring Los Angeles or Philadelphia in to hear it from the horse's mouth. We didn't hear that. And to rely upon inferences and quotes that are ambiguous because the B-Pro-1 and B-Pro-2 were both available and both sold to those customers isn't the kind of record evidence that supports the jury verdict on that issue. The second issue we have on our cross-appeal is the public use issue. On this issue, I think the key element is to determine whether amongst and between all the players involved here, Mr. Ditch, an employee of the Transit Authority, Mr. Razavi, a vendor to the same Transit Authority, and the employees of both companies and some outsiders who saw this invention demonstrated, and there's no dispute here that it was demonstrated in 1994. Mr. Ditch said it had all the elements contained in the patent. There's no experimental use argument. Do those people all have a duty to keep this a secret to each other? And the answer is no. How could employees of a company owned by the vendor have a duty to either Long Beach or Mr. Ditch to keep that a secret in the absence of any agreement with them? There's no record evidence to say they agreed to keep it a secret. They're just arguing. Mr. Ditch is wearing two hats. He's wearing the hat of Long Beach when it's convenient to keep it a secret, and he's wearing his own hat when he wants to exploit and commercialize this invention. He can't have it both ways. The disclosure to the ultimate customer at the beginning is a public disclosure without any horror of confidentiality. It's a matter of all time. Thank you. Mr. Dickinson? Yes, sir? With respect to the convoy sales argument, the McLaughlin testimony comes to simply the mechanical operation of the ARM and does not go to the function of the wheelchair restraint system from the standpoint of the end user and the customers that buy it, which is to outfit, completely outfit, a city bus that complies with the ADA. With respect to the fixed and the flip-up seat relationship, I think that there is, that the uniformity of appearance is an aesthetic function that was demanded by the customers. There's no evidence in the record that any customer ever bought fixed seats and flip-up seats from separate suppliers. With respect to the Vepro 2 sales, the majority of these sales were to Los Angeles and SEPTA, and I think that the evidence is clear. First of all, I think it's conceded by a counsel for USSC, not in the presence of the jury, but on the record of the trial court, that there was this, that there were Vepro 2s sold, delivered, to customers who had originally purchased on the basis of an offer to sell Vepro 1. My question is, how do we identify these? We're handicapped by the fact that this March 16, 2004 memo shows up less than a week before trial. I think that that alone is pretty persuasive evidence, and if that's not enough, I think all you have to do is look at the evidence that USSC cites in the subsequent correspondence by email between USSC and SEPTA, which was found in the appendix of A637 and A638, which I believe goes through May. SEPTA and USSC are still talking about this switchover and the discussions about, can we go ahead and make the switchover without getting the approval of SEPTA? Should we go back and retrofit 100 buses that have already been delivered with the Vepro 1? I think that is clear. SEPTA ended up with Vepro 2 based on the offer to sell Vepro 1. Mr. Gaffin contends that LA also, LA was the job that was sold in 2001 before Vepro 2 was even on the market. There were substantial deliveries of Vepro 1. Then they started getting Vepro 2 and Michael Chang told Mr. Klotz from USSC that he had some serious reservations about that. Mr. Gaffin contends that, well, if the customer ultimately gives his blessing to it, then it's okay. That, I think, is what the Stryker versus Intermedics case says, that you're not competing on a level playing field if you get the job in the door based upon offering an infringing product and then try to avoid liability for infringement by substituting Vepro 2 that does not infringe. Mr. McLaughlin made his best estimate based upon not only evidence in the record, but discovery documents that had been produced to him by USSC showing the timing of the deliveries of these jobs, and he came to the conclusion that there were five where the customer had initially taken Vepro 1 and then got Vepro 2. USSC never came forward to show, no, these customers were offering Vepro 2. The attempts that Christian Hammer showed to explain how they got these jobs was so conflicting and confusing that I think the jury was within its prowess to completely disregard that and say, if USSC has some reason for convincing us that McLaughlin was wrong, why aren't they coming forward to it? They certainly have the ability to show what this customer has offered. They've never made any type of coherent showing that these five customers were offering Vepro 2 before the sale was made. Was the jury specifically instructed about this theory of damages? Yes. The substitution theory? Yes. And what exactly were they told? Well, that's all right. I'll find it. I don't want to cut and paste in your time. I'll give you the citation to the jury instruction. What they were basically told is that if you find that, and it's in the jury verdict as well, if you find that customers bought Vepro 2, the sales of Vepro 2 were made based upon infringing offers to sell Vepro 1. It's a but-for argument, right? That they wouldn't have bought the Vepro 2 if it hadn't been for the Vepro 1 offer. Yes. OK, thanks. That's what I was looking for. Thank you. Mr. Guffin? First, to answer Judge Branson's question, A79 of the appendix in the court's post-trial opinion that the court recites all the jury instructions, and the jury instruction on the switch argument is contained there on page A79. Right. OK. This foot-in-the-door argument is interesting because with respect to these customers, USSC was already doing business. It had its foot in the door selling bus seats. So I think that's telling in terms of the argument that, while you had to offer the infringing restraint device to get your foot in the door, USSC was already there selling a product. Two, the McLaughlin testimony about the meaning of this email is not the kind of sound economic proof required to prove damages, which the case law says you have to have. It's his opinion about the meaning of a third-party email. And it's American seating's burden to prove damages. And they didn't get there to criticize USSC for not making a better record when American seating failed. That's a big risk to a trial lawyer to make a precise case for it. Now, did you—you don't, I take it, have a problem with the language used in the jury instruction? The language we asked the trial judge to add was that if the customer agreed to make the change, that took it out of—we asked him to work it out. Did you object to the instruction based on the failure to include that argument? It was a customer choice issue. Okay. Three, Stryker. Stryker was a kit, and the infringement occurred because whether you included the guard or not, the sleeve or not, you did the operation. These are separate components that are being sold. This wasn't a kit. I think Stryker's distinguishable on the specs. All right. Thank you. Thank you very much. The case is submitted.